UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JEFFREY PLIMPTON,
*Plaintiff,*

v.                                                    No. 3:20-cv-00323 (VAB)

BANK OF JACKSON HOLE, *et al*,
*Defendant.*

## RULING AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTIONS TO DISMISS

Jeffrey Plimpton ("Plaintiff") filed this action *pro se* against Bank of Jackson Hole, Ballard Spahr, LLP ("Ballard Spahr"), Gary Barney, Lucas Buckley, DFWU, LLC ("DFWU"), Estate of Patricia A. Lane, Michael Gilbert, Hathaway & Kunz, P.C. ("Hathaway & Kunz"), Charles Hingle, Holland & Hart, LLP ("Holland & Hart"), Colleen Lane, Matthew W. Lane, Patricia E. Lane, Robert M. Lane, Timothy J. Lane, Dennis O'Malley, Scott Meier, David Perino, Randy Royal, John Smiley, and Windriver Corp. of WY, LLC ("Windriver") (collectively, "Defendants"). Compl., ECF No. 1 (Mar. 11, 2020).

Mr. Plimpton alleges thirteen counts against various defendants, including breach of fiduciary duty by trustee, conspiracy to breach a fiduciary duty by trustee, breach of contract of trustees, breach of duty of managers, breach of contract of managers, intentional tortious interference with contract, negligent tortious interference with contracts, conversion, fraud, conspiracy to commit fraud, unjust enrichment, and negligence. *Id.* at 26–32 ¶¶ 118–144. Mr. Plimpton also moved for a preliminary injunction. Emergency Mot. for Preliminary Injunction, ECF No. 2 (Mar. 11, 2020) ("Mot. for PI")

Bank of Jackson Hole and David Perino (together, "Bank Defendants") as well as Gary

Barney, Randy Royal, Ballard Spahr LLP, Dennis O'Malley, John Smiley, Michael Gilbert,

Charles Hingle, Holland & Hart LLP, Colleen Lane, Patricia E. Lane, and the Estate of Patricia

A. Lane (together, "Estate Defendants") moved to dismiss Mr. Plimpton's Complaint under

Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). Mot. to Dismiss, ECF No. 57

(June 15, 2020) ("Bank and Estate Mot."). Bank Defendants also filed a supplemental motion to

dismiss under Rule 12(b)(2). Suppl. Mot. to Dismiss, ECF No. 60 (June 15, 2020) ("Bank Suppl.

Mot.").

Timothy J. Lane and Matthew W. Lane (together, "Lane Defendants") also moved to

dismiss the Complaint under Rules 12(b)(1), 12(b)(2), and 12(b)(6). Mot. to Dismiss, ECF No.

69 (June 30, 2020) ("Lane Mot.").

Lucas Buckley, Scott Meier, and Hathaway & Kunz, P.C. (together, "Hathaway

Defendants") moved to dismiss under Rules 12(b)(2), 12(b)(5), and 12(b)(6). Mot. to Dismiss,

ECF No. 102 (Sept. 21, 2020) ("Hathaway Mot."). The Hathaway Defendants later renewed their

motion to dismiss in response to Mr. Plimpton's alleged proof of service. Renewed Mot. to

Dismiss, ECF No. 116 (Oct. 26, 2020) ("Renewed Hathaway Mot.").

For the following reasons, the Bank and Estate Defendants' motion to dismiss is

**GRANTED**; the Bank Defendants' supplemental motion to dismiss is **GRANTED**; the Lane

Defendants' motion to dismiss is **GRANTED**; and the Hathaway Defendants' motion to dismiss

is **GRANTED**, and their renewed motion to dismiss is **DENIED** as moot. The case will be

**TRANSFERRED** to Wyoming. Mr. Plimpton's motion for preliminary injunction is **DENIED**

as moot.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

Mr. Plimpton alleges that he "holds title, ownership[,] and rights to the tort claims and related claims of . . . Christopher Lane in the Robert M. Lane Individual Retirement Account ("Lane IRA")" and "the Penobscot Enterprises, Inc. Defined Benefit Pension Trust ("Penobscot Pension")." Compl. ¶¶ 34–35.

Robert M. Lane and John T. Rudnick allegedly "served as [c]o-[t]rustees of the [Penobscot] Pension Plan until 2008, when Patricia E. Lane became [t]rustee." *Id.* ¶ 85. Patricia E. Lane allegedly "served as a [t]rustee of the Penobscot Pension starting in late 2008 and there is no record of her resigning as [t]rustee." *Id.* ¶ 86.

Mr. Plimpton alleges that "[s]ometime after the Lane IRA was created, [Bank of Jackson Hole] was appointed [t]rustee of the Lane IRA." *Id.* ¶ 39.

In 2010, Bank of Jackson Hole allegedly "transferred cash, securities[,] and other assets valued at approximately $840,000 from the Lane IRA to . . . DFWU, LLC, as a capital contribution in exchange for approximately 38% of its membership interests." *Id.* ¶ 40. Mr. Plimpton alleges that these "membership interests became an asset of the [Lane] IRA" and "[t]hereafter, the Lane IRA's primary asset to fund retirement was the membership interests in DFWU." *Id.*

At this time, Bank of Jackson Hole also allegedly "transferred cash, securities[,] and other assets valued at approximately $1,260,000 to . . . DFWU . . . , as capital contribution in exchange for approximately 62% of its membership interests." *Id.* ¶ 41. Mr. Plimpton again alleges that these "membership interests became [an] asset of the Penobscot Pension" and

"[t]hereafter, the Penobscot Pension's primary asset to fund retirement benefits was the membership interests in DFWU." *Id.*

Patricia E. Lane and Patricia A. Lane allegedly were "[c]o-[m]anagers of . . . DFWU." *Id.* ¶ 42. Mr. Plimpton alleges that Patricia E. Lane, "in her capacity as [c]o-[m]anager . . . entered into a 30[-]year loan agreement" dated June 23, 2010 ("Patricia Lane Loan Agreement"), "commit[ing] to loan up to $5,000,000 to herself in her individual capacity at an 8% interest rate." *Id.* ¶ 43. The loan agreement allegedly required as security all assets of Windriver "up to 150% of the expected maximum loan value." *Id.* Mr. Plimpton alleges the current balance of the loan to be an estimated $3,755,537.40. *Id.*

Patricia A. Lane allegedly "signed the Patricia Lane Loan Agreement individually as [b]orrower, [] as sole [m]anager of Windriver . . . and as [m]anager of DFWU." *Id.* ¶ 44. Mr. Plimpton alleges that the Patricia Lane Loan Agreement was signed in Hilton Head Island, South Carolina. *Id.* ¶ 45.

Mr. Plimpton further alleges that Patricia E. Lane "borrowed virtually all of DFWU's assets[,] leaving it insolvent and unable to pay beneficiary claims for the Lane IRA and the Penobscot Pension." *Id.* ¶ 47.

Patricia A. Lane allegedly was the manager of Windriver, also governed by an operating agreement, which "specifically prohibits the use of Windriver assets for non-company purposes including securing loans of third parties." *Id.* ¶¶ 49–50. Mr. Plimpton also alleges that Patricia E. Lane was appointed manager of Windriver in October 2008 and resigned by e-mail on December 20, 2012. *Id.* ¶ 102. "Following Patricia E. Lane's resignation as [m]anager of Windriver," Reuben D. Associates allegedly was appointed manager. *Id.* ¶ 104.

Patricia E. Lane allegedly was the manager of DFWU and governed by an operating agreement dated February 27, 2012, which "specifically prohibits the use of DFWU assets for other than a company purpose" and the managers from "having the authority to possess Company property, or assign its rights in specific Company property for other than a Company purpose." *Id.* ¶¶ 52–53 (internal quotation marks omitted).

Mr. Plimpton alleges that Patricia E. Lane and Patricia A. Lane "failed to hold . . . [a] meeting to approve the Patricia [] Lane Loan Agreement even though [m]anager Patricia E. Lane had a conflict of interest." *Id.* ¶ 54.

On May 4, 2012, a UCC-1 financing statement was allegedly filed in Delaware, "perfecting DFWU['s] . . . security interest against Windriver['s] . . . assets." *Id.* ¶ 55.

In 2012, "on several dates," as Mr. Plimpton alleges, "approximately $2,029,000 was transferred in a number of installments" from DFWU "to a joint bank account owned by" Patricia E. Lane and Patricia A. Lane. *Id.* ¶ 56. Mr. Plimpton alleges that Patricia E. Lane and Patricia A. Lane "accepted the loan proceeds" and "made no attempt to return them." *Id.* ¶ 57.

In 2012, Timothy J. Lane allegedly became a manager of DFWU. *Id.* ¶ 58.

On September 28, 2012, DFWU allegedly "filed a second UCC-1 financing statement" in Delaware "further perfecting its security interests" against Windriver's assets. *Id.* ¶ 59.

On February 5, 2013, the Lane IRA allegedly "filed a UCC-1 financing statement" in Delaware "perfecting a security interest" against DFWU's assets. *Id.* ¶ 60.

On August 29, 2013, Patricia A. Lane, through her attorneys Scott Meier, Lucas Buckley, and Hathaway & Kunz, allegedly "made representations that the approximate amount of $2,029,000 taken as a loan from [DFWU], was a gift from [DFWU] . . . to Patricia E. Lane." *Id.* ¶ 61. Mr. Plimpton alleges that these representations were made "despite the fact that such a gift

would have been in violation of [DFWU's] [o]perating [a]greement, . . . the Penobscot Pension Plan agreement, the Lane IRA agreement[,] and ERISA." *Id.*

Mr. Plimpton further alleges that "[n]either Patricia E. Lane nor Patricia A. Lane are believed to have filed gift tax returns claiming a gift of the $2,029,000 or any similar amount or any portion thereof." *Id.* ¶ 62. He alleges that "a substantial portion" of the $2,029,000 "was used by . . . Patricia E. Lane for her and . . . Patricia A. Lane, Colleen Lane, and Matthew W. Lane's[] personal expenses including legal fees and a $500,000 payment to settle fraud allegations." *Id.* ¶ 63. Mr. Plimpton alleges that "[t]hese actions negatively affected the Lane IRA . . ., adversely affecting the IRA's value and significantly reducing the likelihood that the loan will be repaid and that beneficiaries will receive contractual retirement benefits from the IRS as expected." *Id.*

Regarding the Penobscot Pension, Mr. Plimpton alleges that Patricia E. Lane and Timothy J. Lane "failed to purchase a surety bond as required by law to protect the assets of the Penobscot Pension," "failed to retain an actuary to project annual contributions required for the Penobscot Pension," and "failed to file annual tax returns to the IRS o[n] behalf of the Penobscot Pension during their tenure as Penobscot Plan trustees." *Id.* ¶¶ 64–66.

On or about February 25, 2013, Colleen Lane, Matthew W. Lane, Patricia A. Lane, Patricia E. Lane, and Timothy J. Lane allegedly signed the Lane Family Settlement Agreement, which allegedly transferred the assets of DFWU, the Lane IRA, the Penobscot Pension, and Windriver to Gary A. Barney. *Id.* ¶ 67. Mr. Plimpton alleges that this settlement violated the operating agreements of DFWU, the Lane IRA, and Windriver. *Id.* He also alleges that Gary Barney and his attorney, John Smiley, "made unlawful threats" against Colleen Lane, Matthew W. Lane, Patricia A. Lane, Patricia E. Lane, and Timothy J. Lane "to induce this purported transfer [and] act[] outside of the scope of his appointment as trustee in the bankruptcy of . . .

Robert M. Lane." *Id.* The Lane Family Settlement Agreement allegedly was "signed in various locations, including Westport, [Connecticut]; Denver, [Colorado]; Lander, [Wyoming]; Hilton Head Island, [South Carolina]; Chicago, [Illinois]; Cheyenne, [Wyoming]; and Ajax-Pickering, Ontario, Canada." *Id.* ¶ 68.

Scott Meier, Lucas Buckley, and Hathaway & Kunz allegedly "encouraged their clients to sign the . . . Lane Family Settlement Agreement," which Mr. Plimpton alleges is illegal. *Id.* ¶ 69. Scott Meier also allegedly signed the Lane Family Settlement Agreement. *Id.* ¶ 70.

Mr. Plimpton alleges that before signing the Lane Family Settlement Agreement, "Scott Meier, Lucas Buckley, Hathaway [&] Kunz [], Patricia A. Lane, Patricia E. Lane, Colleen Lane, Matthew Lane, and Kevin J. Lane did not contact any of the beneficiaries of the [Lane] IRA or the Penobscot [Pension] or their attorneys" regarding the "transfer of all of the assets of [the] Lane IRA and the Penobscot Pension to Gary Barney, the bankruptcy trustee." *Id.* ¶ 71.

Mr. Plimpton alleges that as a result of the Lane Family Settlement Agreement, Colleen Lane, Patricia A. Lane, and Patricia E. Lane "reaped personal benefits, namely the dismissal of pending adversarial lawsuits against them." *Id.* ¶ 72. He alleges that "[s]pecifically, Patricia E. Lane and Colleen Lane were dismissed from multiple adversarial proceedings alleging wrongdoing by them in the same contracts whereby they relinquished their rights to object to false claims." *Id.* ¶ 73.

Mr. Plimpton alleges that "[a]lthough [the Lane Family Settlement Agreement] was subsequently approved by the United States Bankruptcy Court for the District of Wyoming on June 20, 2013, the [bankruptcy] court did not resolve the legal issues raised in this Complaint by the purported transfer of [DFWU and its assets]." *Id.* ¶ 73.

Patricia A. Lane, Patricia E. Lane, Robert M. Lane, Timothy J. Lane, Bank of Jackson Hole, David Perino, and Charles Hingle allegedly "all had copies of the DFWU . . . [o]perating [a]greement dated February 27, 2012." *Id.* ¶ 74.

Mr. Plimpton alleges that the defendants "knew or should have known that the transfer of the Lane IRA and Penobscot Pension assets violated"  the DFWU operating agreement, the Windriver operating agreement, the Lane IRA agreement, ERISA, the Penobscot Pension agreement, and federal bankruptcy law. *Id.* ¶ 75.

At all relevant times, the Bank of Jackson Hole allegedly was the "sole [t]rustee of the Lane IRA[,] which owned 38% of the membership units" of DFWU. *Id.* ¶ 77. Mr. Plimpton alleges that Bank of Jackson Hole did not "attempt to review the actions" of the managers of DFWU, "seek to hold the [m]anager(s) accountable for mismanagement" of DFWU, or "object to the turnover of exempt retirement assets in a bankruptcy case." *Id.*

Mr. Plimpton alleges that the Bank of Jackson Hole, David Perino, the bank's Executive Vice President, Charles Hingle, the bank's attorney, and Holland & Hart, the bank's law firm, were "aware that the retirement plan assets are exempt in bankruptcy, but nonetheless they turned over assets of the Lane IRA, DFWU . . . , the Penobscot Pension[,] and Windriver . . . without objection" and "without advising all beneficiaries or their attorneys of their actions." *Id.* ¶¶ 78–79. Bank of Jackson Hole, David Perino, Charles Hingle, and Holland & Hart allegedly transferred the assets of DFWU to Patricia E. Lane and Patricia A. Lane by wire transfer to their accounts. *Id.* ¶ 80.

Mr. Plimpton alleges that Scott Meier, Lucas Buckley, and Hathaway & Kunz "as experienced lawyers . . . were well aware that [t]he Lane Family Settlement Agreement violated several contracts, . . . federal and state bankruptcy law,  . . . [and] ERISA, but nonetheless

advised their clients to sign [the] agreement [and] sign[ed] the [a]greement themselves." *Id.* ¶ 81. Mr. Plimpton alleges that the Scott Meier, Lucas Buckley, and Hathaway & Kunz "reaped significant legal fees and financial benefits for themselves in return for convincing Patricia E. Lane, Patricia A. Lane, Colleen Lane, and Matthew W. Lane to sign the . . . Lane Family Settlement Agreement." *Id.* ¶ 82.

Mr. Plimpton alleges that during her time as trustee of the Penobscot Pension, Patricia E. Lane did not send "regular statements or communications to the beneficiaries," file IRS tax returns, or obtain "a financial bond to protect the Penobscot Pension's assets." *Id.* ¶¶ 87–89.

Mr. Plimpton further alleges that, in 2013, Bank of Jackson Hole, David Perino, and Charles Hingle transferred $21,109.80 owned by DFWU to Gary Barney, allegedly violating the various operating agreements and interfering with Mr. Plimpton's interests in the Lane IRA and Penobscot Pension Plan. *Id.* ¶ 93. This transfer allegedly was completed without a court order. *Id.* ¶ 94. Bank of Jackson Hole, David Perino, and Charles Hingle allegedly "failed to advise of the beneficiaries of the Lane IRA and the Penobscot Pension of [the] transfer." *Id.* ¶ 95.

In 2013, Bank of Jackson Hole, David Perino, Charles Hingle and Holland & Hart allegedly "filed a false claim in the bankruptcy of . . . Robert M. Lane with the United States Bankruptcy Court for the District of Wyoming in which they represented that [Robert M. Lane] owed . . . Bank of Jackson Hole over $15,000,000." *Id.* ¶ 96. Mr. Plimpton alleges that "the loan documents reveal that the borrower was the Boulder Investment Trust[, that] the loan was fully secured by assets owned by Boulder and Windriver [], and that the loan was never personally guaranteed by . . . Robert M. Lane." *Id.* ¶ 96.

Mr. Plimpton further alleges that Bank of Jackson Hole and Charles Hingle "turned over $19,651,594.93 in secured [Windriver] assets" to Gary Barney, which Mr. Plimpton alleges

violated the various operating agreements, statutes, and his interests in the Lane IRA and Penobscot Pension. *Id.* ¶ 97.

Gary Barney and Randy Royal allegedly "made a $14,477,802.96 distribution from the sale of secured [Windriver] assets" to Bank of Jackson Hole in the bankruptcy proceeding. *Id.* ¶ 98. Mr. Plimpton alleges that Gary Barney, Randy Royal, John Smiley, Dennis O'Malley, and Linquist & Vennum "received commissions totaling 39% on the collection and liquidation assets." *Id.*

On or about February 25, 2013, following her alleged removal as a trustee of Boulder Investment Trust, Colleen Lane allegedly "signed a document purporting to transfer all of the assets of Boulder Investment Trust, including [Windriver]," to Gary Barney. *Id.* ¶ 101. Mr. Plimpton again alleges that Gary Barney, "with the assistance of John Smiley and Michael Gilbert," "made unlawful threats" against Colleen Lane "to induce this . . . transfer and otherwise acted outside the scope of his appointment as trustee in the bankruptcy." *Id.*

Mr. Plimpton also alleges that, on or about February 25, 2013, Patricia E. Lane signed the Lane Family Settlement Agreement, "purporting to be the [m]anger of . . . Windriver [] when she was not." *Id.* ¶ 103. Gary Barney allegedly "made unlawful threats" against Patricia E. Lane "to induce this . . . transfer and otherwise acted outside of the scope of his appointment as trustee in the bankruptcy." *Id.*

On or about February 25, 2013, following its alleged resignation as manager of Windriver, Reuben D. Associates and Merlyn Knapp allegedly "signed a document purporting to agree to transfer [Windriver] and all of its assets" to Gary Barney. *Id.* ¶ 105. Mr. Plimpton alleges that Mr. Barney "made unlawful threats" against Reuben D. Associates and Merlyn

Knapp "to induce this . . . transfer and otherwise acted outside the scope of his appointment as trustee in the bankruptcy." *Id.*

On June 20, 2013, Gary Barney allegedly became manager of Windriver. *Id.* ¶ 106. Mr. Plimpton alleges that as manager, Mr. Barney "unlawfully and outside of the scope of his appointment as trustee in the bankruptcy . . . sold all of the assets of [Windriver] without regard to the perfected security interest of [DFWU], failing to remit any of the proceeds of [the] sale to [DFWU]." *Id.*

Gary Barney and Randy Royal allegedly "liquidated assets worth over $8,100,000 for about $5,600,000 that were owned by the [Lane] IRA and the [Penobscot] Pension Plan without remitting any of the liquidation proceeds to the IRA or the Pension Plan." *Id.* ¶ 107. They also allegedly "liquidated all of the assets at issue, and distributed" them to creditors of Robert Lane "in both proper and improper amounts." *Id.* ¶ 109.

Mr. Plimpton alleges that Gary Barney "knowingly obtained signatures" from Patricia A. Lane, Robert Lane, DFWU, Windriver, Patricia E. Lane, Matthew Lane, Timothy Lane, and Colleen Lane "that were without authority to transfer the assets that he sought control over." *Id.* ¶ 108. Mr. Plimpton alleges that Mr. Barney "did not gain any of these signatures [under] court order, but used unlawful threats to gain signatures knowing that some signed as trustees when they were not trustees, some signed as managers when they were not managers, and otherwise none had lawful authority to transfer any entities or assets." *Id.*

Mr. Plimpton alleges that John Smiley, Michael Gilbert, Dennis O'Malley, and Ballard Spahr LLP "conspired with" Gary Barney and Randy Royal "in all of their actions set forth in [his] Complaint, cooperating with them, advising and assisting them, and collecting a commission for legal fees and expenses for the collection of and liquidation of all of the assets."

11

*Id.* ¶ 110. Mr. Plimpton alleges that over "$9,000,000 in legal fees" were collected, "leaving insufficient assets for the Lane IRA and the Penobscot Pension [Plan] to pay their beneficiaries." *Id.* ¶ 111.

In 2012, Scott Meier, Lucas Buckley, and Hathaway & Kunz allegedly were retained by Boulder Investment Trust and Windriver. *Id.* ¶ 112. Mr. Plimpton alleges that because the assets of Windriver served as collateral for the loan to Patricia E. Lane from DFWU, Scott Meier, Lucas Buckley, and Hathaway & Kunz "owed a duty to the Lane IRA and the [Penobscot] Pension Plan, and to the beneficiaries." *Id.*

Also, in 2012, Scott Meier, Lucas Buckley, and Hathaway & Kunz allegedly were retained by Patricia E. Lane, which Mr. Plimpton alleges was "in conflict with the interests of" Boulder Investment Trust, Windriver, DFWU, the Lane IRA, the Penobscot Pension Plan, and his interests in the Lane IRA and the Penobscot Pension Plan. *Id.* ¶ 113. Mr. Plimpton further alleges that Scott Meier, Lucas Buckley, and Hathaway & Kunz "received legal fees and expenses" from Gary Barney and Randy Royal. *Id.* ¶ 114.

In 2013, Robert Lane allegedly "signed a document, the Debtor-Trustee Settlement Agreement, agreeing to withdraw his objections to the actions of" Patricia E. Lane, Timothy Lane, Colleen Lane, Reuben D. Associates, Merlyn Knapp, and Gary Barney, "adversely affecting [Mr. Plimpton's] beneficial interests in the [Lane] IRA and the [Penobscot] Pension Plan." *Id.* ¶ 115.

### B. Procedural History

On March 11, 2020, Mr. Plimpton filed his Complaint against the Defendants. Compl. That same day, Mr. Plimpton also filed an emergency motion for preliminary injunction. Mot. for PI.

On April 14, 2020, Mr. Plimpton moved to set aside the Court's previous orders granting extensions of time. Mot. to Set Aside, ECF No. 20 (Apr. 14, 2020). The next day, the Court denied this motion. Order, ECF No. 21 (Apr. 15, 2020).

On May 19, 2020, Mr. Plimpton filed motions requesting the Court to reconsider its order granting Michael Gilbert's *pro hac vice* application, Mot. for Recons., ECF No. 49 (May 19, 2020); an extension of time to serve all summonses, Mot. for Extension of Time, ECF No. 50 (May 19, 2020); and an extension of time for the Rule 26(f) Conference, Mot. for Extension of Time, ECF No. 51 (May 19, 2020). The next day, the Court denied these motions. Order, ECF No. 52 (May 20, 2020); Order, ECF No. 53 (May 20, 2020); Order, ECF No. 54 (May 20, 2020).

On June 15, 2020, the Bank and Estate Defendants filed a motion to dismiss and supporting materials. Bank and Estate Mot.; Mem. in Supp. of Mot. to Dismiss, ECF No. 58 (June 15, 2020) ("Bank and Estate Mem."). That same day, the Bank Defendants filed a supplemental motion to dismiss. Bank Suppl. Mot.

On June 30, 2020, the Lane Defendants filed a motion to dismiss and supporting materials. Lane Mot.; Mem. in Supp. of Mot. to Dismiss, ECF No. 70 (June 30, 2020) ("Lane Mem.").

The same day, Mr. Plimpton moved for default judgment against Matthew Lane. Mot. for Default J., ECF No. 74 (June 30, 2020).

Robert M. Lane also filed on Answer on that day. Answer, ECF No. 75 (June 30, 2020) ("Robert Lane Answer").

On July 15, 2020, the Court denied Mr. Plimpton's motion for default judgment because Mr. Matthew Lane responded by filing a motion to dismiss. Order, ECF No. 77 (July 15, 2020).

On August 14, 2020, Gary Barney, Randy Royal, Ballard Spahr LLP, Dennis O'Malley, John Smiley, Michael Gilbert, Charles Hingle, and Holland & Hart LLP (together, "Trustee Defendants") filed a first notice of additional authority. Notice, ECF No. 81 (Aug. 14, 2020).

On August 17, 2020, Mr. Plimpton filed an objection to the Bank and Estate Defendants' motion to dismiss, the Bank Defendants' supplemental motion to dismiss, and the Lane Defendants' motion to dismiss. Obj., ECF No. 82 (Aug. 17, 2020); Mem. in Supp. of Pl.'s Obj., ECF No 82-1 (Aug, 17, 2020) ("Pl. Obj.").

On August 20, 2020, Mr. Plimpton filed an amended objection and supporting memorandum. Am. Pl.'s Obj to Mot. to Dismiss, ECF No. 84 (Aug. 20, 2020); Am. Mem. in Supp. of Pl.'s Obj., ECF No. 84-1 (Aug. 20, 2020) ("Pl. Am. Obj.").

On August 27, 2020, Mr. Plimpton filed an objection to the first notice of additional authority. Obj. to Notice, ECF No. 91 (Aug. 27, 2020).

On September 17, 2020, the Lane Defendants, with Colleen Lane, Patricia E. Lane, and the Estate of Patricia A. Lane; the Trustee Defendants; and the Bank Defendants filed replies to Mr. Plimpton's amended objection. Resp. to Am. Obj., ECF No. 99 (Sept. 17, 2020) ("Lane Reply"); Reply in Supp. Defs.' Mot. to Dismiss, ECF No. 100 (Sept. 17, 2020) ("Trustee Reply"); Reply Mem. in Supp. of Suppl. Mot. to Dismiss, ECF NO. 101 (Sept. 17, 2020) ("Bank Reply").

On September 21, 2020, the Hathaway Defendants filed a motion to dismiss and supporting materials. Hathaway Mot.; Mem. in Supp. of Mot. to Dismiss, ECF No. 103, Sept. 21, 2020) ("Hathaway Mem.").

On October 9, 2020, Mr. Plimpton filed an objection and supporting materials, opposing the Hathaway Defendants' motion to dismiss. Obj., ECF No. 110 (Oct. 9, 2020) ("Pl. Hathaway Obj."); Mem. in Supp. of Obj., ECF No. 111 (Oct. 9, 2020) ("Pl. Hathaway Obj. Mem.").

On October 23, 2020, the Hathaway Defendants filed a reply to Mr. Plimpton's objections. Reply, ECF No. 115 (Oct. 23, 2020) ("Hathaway Reply").

On October 26, 2020, the Hathaway Defendants renewed their motion to dismiss. Renewed Hathaway Mot.

On October 29, 2020, Gary Barney, Randy Royal, Ballard Spahr LLP, Dennis O'Malley, John Smiley, and Michael Gilbert filed a notice of additional authority. Notice, ECF No. 117 (Oct. 29, 2020).

On November 12, 2020, Mr. Plimpton filed objections to the Hathaway Defendants' renewed motions and the Estate Defendants' notice of additional authority. Obj. to Notice, ECF No. 119 (Nov. 12, 2020); Obj. to Renewed Mot. to Dismiss, ECF No. 120 (Nov. 12, 2020) ("Obj. Renewed Hathaway Mot.").

On November 18, 2020, Gary Barney, Randy Royal, Ballard Spahr LLP, Dennis O'Malley, John Smiley, and Michael Gilbert filed a response to Mr. Plimpton's objection to their notice of additional authority. Resp. to Obj. to Notice, ECF No. 121 (Nov. 18, 2020).

On November 24, 2020, the Hathaway Defendants filed a reply to Mr. Plimpton's objection to their renewed motion to dismiss. Reply, ECF No. 122 (Nov. 24, 2020) ("Hathaway Renewed Reply").

## II.    STANDARD OF REVIEW

### A.  Rule 12(b)(1)

Federal courts are "courts of limited jurisdiction." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (internal quotation mark omitted). "Congress has granted district courts original jurisdiction over . . . certain cases between citizens of different states, so long as the requirements of complete diversity and amount in controversy are met." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013). The burden of persuasion for establishing diversity jurisdiction rests on the party asserting it. *Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010); *see also Herrick Co. Inc. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322–23 (2d Cir. 2001) (the party asserting diversity jurisdiction "bears the burden of demonstrating that the grounds for diversity exists and that diversity is complete"). The party invoking the court's jurisdiction must support allegations of complete diversity with "competent proof." *Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998). "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

"A case is properly dismissed for lack of subject matter jurisdiction under [Federal Rule of Civil Procedure] 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); Fed. R. Civ. P. 12(b)(1). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the [C]ourt must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000); *see also Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (quoting *Sweet*, 235 F.3d at 83). The Court also may resolve disputed jurisdictional fact issues, however, "by referring to evidence outside of the

16

pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F. Supp. 2d 293, 298 (D. Conn. 2009) (citing *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)).

### B.  Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). The plaintiff therefore must make a prima facie showing that jurisdiction exists. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

"This prima facie showing must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id*. (internal quotation marks omitted); *see also Glenwood Sys., LLC v. Med-Pro Ideal Sols., Inc.*, No. 3:09-cv-956 (WWE), 2010 WL 11527383, at *2 (D. Conn. May 4, 2010) ("At this stage of the proceedings, if the court relies upon pleadings and affidavits, the plaintiff must make out only a prima facie showing of personal jurisdiction, and the affidavits and pleadings should be construed most favorably to the plaintiff."), *aff'd*, 438 F. App'x 27 (2d Cir. 2011) (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)). A court considers the facts as they existed when the plaintiff filed the complaint. *See id.* (citing *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 52 (2d Cir. 1991)).

### C.  Rule 12(b)(5)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(5) due to insufficient service of process "must be granted if the plaintiff fails to serve a copy of the summons and

complaint on the defendants [under] Rule 4 of the Federal Rules [of Civil Procedure], which sets forth the federal requirements for service." *Rzayeva v. United States*, 492 F. Supp. 2d 60, 74 (D. Conn. 2007); *see* Fed. R. Civ. P. 12(b)(5). "Once validity of service has been challenged, it becomes the plaintiff's burden to prove that service of process was adequate." *Cole v. Aetna Life & Cas.*, 70 F. Supp. 2d 106, 110 (D. Conn. 1999).

### D. Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), a court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. A court also views

the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

### E.  Preliminary Injunction

Preliminary injunctive relief is an "extraordinary remedy" and not a matter of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction under Federal Rule of Civil Procedure 65, a movant "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter*, 555 U.S. at 20); *see also Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

When deciding a motion for preliminary injunction, "a court may consider the entire record including affidavits and other hearsay evidence." *Johnson v. Newport Lorillard*, No. 01 Civ. 9587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003). The moving party, however, must also make a "clear or substantial" showing of a likelihood of success if the injunction sought will alter, rather than maintain the status quo. *See Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

In the Second Circuit, "[t]he same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order." *Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264, 272 (N.D.N.Y. 2015) (citing *Local 1814 Int'l Longshoreman's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n., Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992) (recognizing that the standard for a temporary restraining order is the same as preliminary injunction standard)). Irreparable harm is "[t]he most significant condition which must be present to support the granting of a temporary injunction." *Cap. City Gas Co. v. Phillips Petroleum Co.*, 373 F.2d 128, 131 (2d Cir. 1967); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) ("[T]he moving party must first demonstrate that [irreparable] injury is likely before the other requirements for the issuance of an injunction will be considered."). As with a request for preliminary injunctive relief, the moving party must show irreparable harm that is "not remote or speculative" but "actual and imminent." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

Finally, because there is a *pro se* party, that party's filings generally would be construed "liberally" and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006); *see also Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994) (explaining that *pro se* litigants should be afforded "special solicitude" because they

are not represented by counsel). But "a lawyer representing [oneself] ordinarily receives no such solicitude at all." *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010). In any event, any pleading must meet the "pleading standards otherwise prescribed by the Federal [R]ules of Civil Procedure" in order for the case to continue. *Suares v. Verizon Commc'ns Inc.*, C.A. No. 11-civ-5050 (LAP), 2012 WL 4571030, at *3 (S.D.N.Y. 2012) (internal quotation marks omitted).

## III.    DISCUSSION

The Bank and Estate Defendants move to dismiss under Rules 12(b)(1), 12(b)(2), and 12(b)(6). Bank and Estate Mot. at 1. They argue that (1) the Court lacks subject matter jurisdiction over Gary Barney, Randy Royal, Ballard Spahr LLP, Dennis O'Malley, John Smiley and Michael Gilbert under the *Barton* doctrine; (2) the Court lacks personal jurisdiction over all of the Bank and Estate Defendants except Colleen Lane; (3) Plaintiff's claims against the Bank and Estate Defendants are barred by Connecticut's statutes of limitations; and (4) Plaintiff's claims against the Bank and Estate Defendants are barred by *res judicata* and collateral estoppel. *Id.* at 2.

The Bank Defendants files an additional motion to supplement the personal jurisdiction arguments. Bank Suppl. Mot.

The Lane Defendants also move to dismiss under Rules 12(b)(2), and 12(b)(6). Lane Mot. at 1. The Lane Defendants adopt and join the arguments set out by the Bank and Estate Defendants regarding personal jurisdiction, statutes of limitations, and issue and claim preclusion. Lane Mot. at 2; Lane Mem. at 2.

Finally, the Hathaway Defendants move to dismiss under Rules 12(b)(2), 12(b)(5) and 12(b)(6). Hathaway Mot. at 1. They adopt and join the Bank and Estate Defendants' arguments regarding personal jurisdiction, statutes of limitation, and issue and claim preclusions. *Id.*;

Hathaway Mem. at 1–2. Additionally, Hathaway Defendants argue that the service of process on them was insufficient. Hathaway Mot. at 2.

 The Court will address each argument in turn.

### A. *Barton* Doctrine

"It is well settled that when an individual sues a trustee for acts taken in the trustee's capacity as an officer of the court, the individual must first obtain leave of the court that appointed the trustee." *Peia v. Coan*, No. CIV.A. 305CV1029 SRU, 2006 WL 798873, at *1 (D. Conn. Mar. 23, 2006) (citing *Barton v. Barbour,* 104 U.S. 126, 131 (1881); *In re Lehal Realty Assocs.,* 101 F.3d 272, 276 (2d Cir. 1996); *Vass v. Conron Bros. Co.,* 59 F.2d 969 (2d Cir. 1932)).

> The *Barton* Doctrine is based on the principle that "a trustee in bankruptcy is an officer of the court that appoints him." Therefore, the purpose of the *Barton* Doctrine is to give effect to the appointing court's strong interest in protecting the trustee from personal liability for acts taken within the scope of the trustee's official duty. That does not mean that an individual may not sue a trustee for actions taken in his official capacity, but rather that he must simply obtain leave of the court that appointed the trustee before suing the trustee in another court.

*Id.* (quoting *In re Lehal Realty Assocs.,* 101 F.3d at 276); *see also Amelio v. Morris*, No. 19-CV-8696 (JPO), 2019 WL 5294931, at *2 (S.D.N.Y. Oct. 18, 2019) (finding that "Plaintiff must first seek leave from the bankruptcy court before filing a lawsuit against the trustee" and collecting cases). Additionally, [t]he *Barton* Doctrine extends to attorneys who represent the bankruptcy estate, not only to the trustee himself." *Peia*, 2006 WL 798873, at *1 (internal citations omitted).

Courts recognize that "there is an exception to the *Barton* Doctrine, codified in 28 U.S.C. § 959. *Id.* at *2. Under this exception, "individuals do not need to obtain leave of court before suing a bankruptcy trustee if the claim is based on the trustee's 'acts or transactions in carrying

on business connected with' the bankruptcy estate, as opposed to the trustee's acts or transactions in carrying out his responsibilities as trustee." *Id.* (quoting 28 U.S.C. § 959(a)).

While the Second Circuit has not addressed the *Barton* Doctrine, other Circuits have recognized other exceptions. Some courts recognize an exception to the *Barton* Doctrine "where the trustee should have obtained a court order and did not." *In re Biebel*, No. 02-32865 LMW, 2009 WL 1451637, at *5 (Bankr. D. Conn. May 20, 2009) (citing *Leonard v. Vrooman,* 383 F.2d 556, 560 (9th Cir.1967), *cert. denied,* 390 U.S. 925 (1968) ("[A] trustee wrongfully possessing property which is not an asset of the estate may be sued for damages arising out of his illegal occupation in a state court without leave of his appointing court")). "Moreover, the trustee is not protected by the *Barton* Doctrine if the trustee obtains a court order but acts beyond its scope." *Id.* (citing *Teton Millwork Sales v. Schlossberg,* No. 07–8091, 2009 WL 323141, at *2 (10th Cir. Feb. 10, 2009) ("[The] *Barton* [Doctrine] also makes it clear that 'if, by mistake or wrongfully, the receiver takes possession of property belonging to another, such person may bring suit therefor against him personally as a matter of right; for in such case the receiver would be acting *ultra vires.*'")). "Facts sufficient to support the allegation that the trustee exceeded the scope of the apparent authorizing order must be pled by the plaintiff at the outset or the *Barton* Doctrine will bar the suit in the non[-]appointing court." *Id.* (citing *In re Lowenbraun,* 453 F.3d 314, 322 (6th Cir. 2006) (holding that "presume[d] . . . acts were a part of the trustee's duties unless Plaintiff initially alleges at the outset facts demonstrating otherwise.")). But other Circuits have declined to recognize exceptions including a "generalized tort exception to the *Barton* Doctrine." *See, e.g.*, *Muratore v. Darr,* 375 F.3d 140, 147 (1st Cir. 2004) (emphasis added).

The Bank and Estate Defendants argue that as "Plaintiff fails to allege he obtained leave from the [b]ankruptcy [c]ourt to file his claims against Gary Barney, Randy Royal, Ballard Spahr LLP, Dennis O'Malley, John Smiley and Michael Gilbert." Bank and Estate Mem. at 12.

Mr. Plimpton argues that "[t]he Chapter 7 Trustees Gary Barney and Randy Royal and their attorneys[,] John Smiley, Michael Gilbert, Dennis O'Malley, and Ballard Spahr, LLP are anxious to avoid a trial." Pl. Am. Obj. at 31. Mr. Plimpton alleges that these defendants "engaged in torts, breaches of contracts, fraud[,] and other misdeeds while operating companies . . . [and] not performing a trustee's ordinary duties." *Id.* Mr. Plimpton argues that "multiple exceptions to the *Barton* Doctrine that apply" in this case. *Id.* (emphasis added). Specifically, Mr. Plimpton argues that the *Barton* doctrine does not apply because (1) the beneficiaries of the Lane IRA and Penobscot Pension were deprived of their property rights without notice and due process, *id.* at 32–36; (2) "the bankruptcy trustee [wa]s engaged in managing and operating businesses . . not in the course of his ordinary trustee duties," *id.* at 36–39; (3) the claims against the trustees and their attorneys involve breach of contract and tortious interference with contracts, *id.* at 39 –41; and (4) "the entire set of allegations against [the trustees and their attorneys] are torts," *id.* at 41–42.

On June 2, 2020, "the Chapter 7 Trustees filed [a] motion [with the bankruptcy court in Wyoming] to [e]nforce [the] *Barton* Doctrine" requesting an "order directing the putative plaintiff [in this case] to dismiss this case against the Chapter 7 Trustees" and their attorneys. Bank and Estate Mem. at 4–5 n.8.  On September 9, 2020, the bankruptcy court "held that the *Barton* Doctrine applied to [Mr. Plimpton]'s claims against [Gary Barney, Randy Royal, Dennis O'Malley, John Smiley, Michael Gilbert, and Ballard Spahr LLP], and ordered Mr. Plimpton to dismiss those claims with prejudice." Trustee Reply at 3. The Trustee Defendants argue that

"[b]ecause the *Barton* Doctrine applies, this Court lacks subject matter jurisdiction over the claims against [Gary Barney, Randy Royal, Dennis O'Malley, John Smiley, Michael Gilbert, and Ballard Spahr LLP] and must dismiss them." *Id.* at 5.

The Court agrees.

As the Trustee Defendants point out in their reply, "[i]t is undisputed [Mr. Plimpton] failed to obtain permission from the Bankruptcy Court before filing this lawsuit." Trustee Reply at 3. Without this prior permission, this Court lacks subject matter jurisdiction over the trustees and their attorneys. *See Amelio,* 2019 WL 5294931, at *2 (dismissing a suit against a "court-appointed trustee in . . . bankruptcy proceedings, her law firm, and employees at the firm . . . under the *Barton* doctrine for lack of subject matter jurisdiction" where the plaintiff "did not seek leave from the bankruptcy court to file suit").

Mr. Plimpton asserts that exceptions to the *Barton* doctrine apply to this case, but his arguments fail for two reasons: the exceptions do not apply to this case, and even if they did, the Second Circuit has not recognized any of these exceptions.

First, the exceptions operative in other Circuits do not apply in this case. Mr. Plimpton's arguments that there are exceptions to the *Barton* Doctrine for claims relate to due process, contracts, or torts are unavailing because they are either an unrecognized exception, *see Muratore,* 375 F.3d at 147 (declining to recognize a "generalized tort exception to the *Barton* Doctrine"), or relate to the Lane Family Settlement Agreement, which was approved by the Wyoming bankruptcy court, *see* Ex. 33 to Trustee's Reply, ECF No. 100-1 at 2, 6 (Sept. 17, 2020) ("September 9, 2020 Bankruptcy Order") (finding that "challenge[s to] the validity of th[e bankruptcy] court's prior orders . . . falls squarely within the doctrine's purpose to prevent other

25

courts from intervening in the bankruptcy court's estate administration). As the bankruptcy court

explained in its September 9, 2020 order:

> Plaintiffs misunderstand the decision the court is asked to make—it
> is not whether Plaintiffs should be granted authority to file suit, it is
> whether their failure to seek this court's permission requires the suits
> be dismissed. The validity, or lack thereof, of Plaintiffs' claims does
> not constrain this court's decision. Plaintiffs must seek permission
> from a bankruptcy court to pursue a claim falling under the purview
> of the *Barton* doctrine even with the most meritorious claim.

*Id.* at 6-7. As for the potential exception under Section 959, Mr. Plimpton argues that "the

bankruptcy trustee [wa]s engaged in managing and operating businesses . . not in the course of

his ordinary trustee duties." *Id.* at 36–39. Again, Mr. Plimpton's claims center on the validity of

the Lane Family Settlement Agreement and the trustees' and their counsel's work related to the

underlying bankruptcy proceedings. Thus, the Section 959 exception is not applicable. *See Peia*,

2006 WL 798873, at *1 ("[T]he facts alleged in P[laintiff]'s complaint support a claim based on

actions taken by [the trustee] in carrying out his official duties as trustee, which are actions that

do not fall within the [Section 959] exception to the *Barton* Doctrine.")

Further, the Second Circuit has not yet endorsed any exceptions to the *Barton* Doctrine.

And because this case does not fall into the exceptions recognized by other circuits, this Court

need not, and does not, decide whether exceptions apply in this jurisdiction.

Accordingly, all claims against Gary Barney, Randy Royal, Dennis O'Malley, John

Smiley, Michael Gilbert, and Ballard Spahr LLP will be dismissed for lack of subject matter

jurisdiction.

## B. Personal Jurisdiction

"[A] court cannot render a judgment without first obtaining personal jurisdiction over the

parties." *Argent Mortgage Co., LLC* v. *Huertas*, 288 Conn. 568, 576 (2008).

Connecticut's long arm statute provides that a nonresident individual foreign will be amenable to a suit in this state if that person:

>　(1) [t]ransacts any business within the state;
>
>　(2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act;
>
>　(3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;
>
>　(4) owns, uses or possesses any real property situated within the state; or
>
>　(5) uses a computer, as defined in subdivision (1) of subsection (a) of section 53-451, or a computer network, as defined in subdivision (3) of subsection (a) of said section, located within the state.

Conn. Gen. Stat. § 52-59b.

"The term 'transacting business,' as used in [Section] 52–59b(a)(1), is not broadly interpreted in Connecticut." *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 489–90 (D. Conn. 2006). A "nonresident individual who has not entered this state physically nevertheless may be subject to jurisdiction in this state under § 52–59b (a)(1) if that individual has 'invoked the benefits and protection of Connecticut's laws' by virtue of his or her 'purposeful Connecticut related activity.'" *Ryan v. Cerullo*, 282 Conn. 109, 120 (2007) (finding no personal jurisdiction where "the defendants derived only minimal income from Connecticut residents, did not solicit business in Connecticut and did not promote themselves as a national accounting firm").

"Generally, 'the transmission of communications between a non-resident defendant and a party within the jurisdiction does not, by itself, constitute the transaction of business in this state.'" *Callahan v. Wisdom*, No. 3:19-CV-00350 (KAD), 2020 WL 2061882, at *5 (D. Conn. Apr. 29, 2020) (quoting *Vitale v. Catanese*, No. 3:11-CV-1831 (MPS), 2013 WL 3992394, at *3 (D. Conn. Aug. 2, 2013) (citing cases)). "So too is 'the negotiation or existence of a contract, standing alone, . . . insufficient to exercise personal jurisdiction over a defendant.'" *Id.* (quoting *HSQD, LLC v. Morinville*, No. 3:11-CV-1225 (WWE), 2012 WL 2088698, at *3 (D. Conn. June 8, 2012)). "However, the existence of a contract along with substantial telephone and email communications related to the contractual relationship can be sufficient to constitute transaction of business in the forum state." *HSQD*, 2012 WL 2088698, at *3.

Under Connecticut General Statutes § 33-929(e), "[e]very foreign corporation which transacts business in this state in violation of Section 33-920[1] shall be subject to suit in this state upon any cause of action arising out of such business." Conn. Gen. Stat. § 33-929(e).

Furthermore, Section 33-929(f) provides:

> Every foreign corporation shall be subject to suit in this state, by a resident of this state . . . on any cause of action arising as follows:
>
> (1) out of any contract made in this state or to be performed in this state;
>
> (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state;
>
> (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured,

---

[1] Under Connecticut General Statutes § 33-920, "[a] foreign corporation, other than an insurance, surety or indemnity company, may not transact business in this state until it obtains a certificate of authority from the Secretary of the State." Conn. Gen. Stat. § 33-920.

marketed or sold or whether or not through the medium of independent contractors or dealers; or

(4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Conn. Gen. Stat. § 33-929(f).

"Ordinarily, the defendant has the burden to disprove personal jurisdiction." *Samelko v. Kingstone Ins. Co.*, 329 Conn. 249, 256 (2018) (citing *Cogswell v. Am. Transit Ins. Co.*, 282 Conn. 505, 515 (2007)). "However, if the defendant challenging the court's personal jurisdiction is a foreign corporation . . . it is the plaintiff's burden to prove the court's jurisdiction." *Id.* (internal quotation marks and alteration omitted)). "To do so, the plaintiffs must produce evidence adequate to establish such jurisdiction." *Id.* (internal quotation marks omitted). For a defendant that is a foreign corporation, "a Connecticut court may obtain personal jurisdiction . . . only if [the] long arm statute permits it." *Id.* at 257 (citing *Kenny v. Banks*, 289 Conn. 529, 533 (2008)).

Three requirements must be met in order for a court to exercise personal jurisdiction: "First, the plaintiff's service of process upon the defendant must have been procedurally proper. Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective. . . . Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (quoting *Licci ex rel. Licci*, 673 F.3d at 59–60). In order to assure that the last prong has been satisfied, a court must determine both "whether a defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction over the defendant and whether the assertion of personal jurisdiction over the defendant comports with traditional notions of fair play and substantial justice under the circumstances of the particular

29

case." *Johnson v. UBS AG*, 791 F. App'x 240, 242 (2d Cir. 2019) (summary order) (quoting *Waldman*, 835 F.3d at 331).

"With respect to minimum contacts . . . a distinction is made between 'specific' jurisdiction and 'general' jurisdiction." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). "Specific jurisdiction exists when 'a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984)). "A court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.*

i. **Charles Hingle, Holland & Hart LLP, Patricia E. Lane, the Estate of Patricia A. Lane, Matthew Lane, Timothy Lane, Scott Meier, Lucas Buckley, Hathaway & Kunz LLP, Bank of Jackson Hole and David Perino**

Bank and Estate Defendants argue that Bank of Jackson Hole, David Perino, Gary Barney, Randy Royal, Ballard Spahr LLP, Dennis O'Malley, John Smiley, Michael Gilbert, Charles Hingle, Holland & Hart LLP, Patricia E. Lane, and the Estate of Patricia A. Lane (together, "Non-Connecticut Defendants") "are not subject to personal jurisdiction in Connecticut." Bank and Estate Mem. at 12 (emphasis omitted). First, the Bank and Estate Defendants argue that "'[t]he Connecticut long-arm statutes do not confer jurisdiction over actions committed by a nonresident party against another nonresident.'" *Id.* (quoting *PSARA Energy, LTD v. SPACE Shipping, LTD*, 290 F. Supp. 3d 158, 165 (D. Conn. 2017)). Because Colleen Lane is the only Connecticut resident in this lawsuit, the Bank and Estate Defendants argue that personal jurisdiction is lacking over the Non-Connecticut Defendants. *Id.* at 13.

Bank and Estate Defendants also argue that "[n]either the applicable long-arm statutes nor the Due Process Clause grants personal jurisdiction over the Non-Connecticut Defendants." *Id.* (emphasis omitted). Citing the Defendants' declarations, the Bank and Estate Defendants argue that many of the Non-Connecticut Defendants "have no presence at all in Connecticut, and none of their Connecticut conduct bears any relation to [Mr. Plimpton]'s claims[] as required by [the Connecticut long-arm statutes] or for the purposes of specific personal jurisdiction." *Id.* at 14-15. Bank and Estate Defendants contend that "[t]he only connection between this action and Connecticut is [Mr. Plimpton]'s allegation that Colleen [Lane] lives in Connecticut and signed the [Lane] Family Settlement Agreement there" and "'[t]he unilateral activities of third parties . . . cannot, in themselves, satisfy the requirement of contact with the forum.'" *Id.* at 15 (quoting *Porina v. Marward Shipping Co.,* 521 F.3d 122, 128 (2d Cir. 2008)).

The Lane Defendants and Hathaway Defendants join and adopt these arguments. *See* Lane Mem. at 1-2; Hathaway Mem. at 1-2

Mr. Plimpton makes several personal jurisdiction arguments for the various defendants. He argues that the Court has specific jurisdiction over Gary Barney, Ballard Spahr, LLP, Lucas Buckley, DFWU, LLC, Hathaway & Kunz LLP, Michael Gilbert, Matthew Lane, Estate of Patricia A. Lane, Patricia E. Lane, Timothy Lane, Scott Meier, Dennis O'Malley, Randy Royal John Smiley, and Windriver Corp because they "were signatories to the [allegedly] illegal contract executed in part in Connecticut." Pl.'s Am. Obj. at 5 (citation omitted).

Mr. Plimpton further argues that Scott Meier, Lucas Buckley, and Hathaway & Kunz LLP purposely availed themselves of Connecticut jurisdiction when they "represented Connecticut parties Colleen Land and the Boulder Investment Trust . . . in the adversarial proceeding." *Id.* at 8. Mr. Plimpton contends that the Hathaway Defendants are at home in

Connecticut because they participated in discovery in Connecticut and had telephonic and e-mail communications with their Connecticut clients. *Id.*

Mr. Plimpton also argues that the Court has personal jurisdiction over Patricia A. Lane, Patricia E. Lane, Matthew Lane, and Timothy Lane because they had contact with Kevin and Colleen Lane through telephone calls, e-mails, and visits. *Id.* 9-10. Mr. Plimpton alleges that they also "communicated and negotiated with Kevin and Colleen Lane with regard to the Lane Bankruptcy, the [a]dversarial [p]roceeding against them, and the negotiation of the [allegedly] illegal *ultra vires* contract that was executed in Connecticut." *Id.*

Additionally, Mr. Plimpton argues that Gary Barney, Ballard Spahr LLP, Lucas Buckley, Hathaway & Kunz LLP, Michael Gilbert, Colleen Lane, Matthew Lane, the Estate of Patricia A. Lane, Patricia E. Lane, Timothy Lane, Scott Meier, Dennis O'Malley, Randy Royal, John Smiley, and Windriver Corp. "committed a tort when they participated in the *ultra vires* Lane Family Settlement Agreement[,] which was signed in part in Connecticut." *Id.* at 14-15.

Mr. Plimpton argues that Gary Barney, Ballard Spahr LLP, Michael Gilbert, John Smiley, Bank of Jackson Hole, Holland & Hart LLP, Randy Royal, Scott Meier, Lucas Buckley, and Hathaway & Kunz "are believed to have derived anywhere from $100,000 to multiple millions in fees from this case based upon their Connecticut related activities." *Id.* at 16. He further argues that Bank of Jackson Hole, Ballard Spahr, and Holland & Hart LLP conduct business in Connecticut, which confers personal jurisdiction. *Id.* at 16-19.

Finally, Mr. Plimpton argues that Bank of Jackson Hole, David Perino, Charles Hingle, Holland & Hart LLP, John Smiley, Michael Gilbert, Dennis O'Malley, Scott Meier, Lucas Buckley, Randy Royal, Colleen Lane, Patricia E. Lane, the Estate of Patricia A. Lane, Matthew

Lane, Timothy Lane, and Hathaway & Kunz LLP are in a conspiracy, and due to Colleen lane's

residency in Connecticut, the Court has personal jurisdiction over the co-conspirators. *Id.* at 20.

With regard to Holland & Hart, the Trustee Defendants reply that general jurisdiction

does not exist over the firm because it has "no offices in (and thus indisputably [is] not domiciled

in) Connecticut" and Mr. Plimpton fails to show that it is "essentially at home" here. Trustee

Reply at 6. The Trustee Defendants argue that the alleged practice by an associate in

Connecticut, the representation of "a few clients in Connecticut over the past [five] years," and

the filing of "a credit client's proof of claim in another state" do not establish that the Court has

general jurisdiction over Holland & Hart. *Id.* 7-8. Moreover, the Trustee Defendants contend that

Mr. Plimpton's allegations that Holland & Hart derived "$100,000 to multiple millions," Pl.'s

Am. Obj. at 16,  in activity in Connecticut  "are insufficient to establish jurisdiction" because the

alleged activity was not substantial enough to "indicate a commercial impact," Trustee Reply at

10 (quoting *Ryan*, 282 Conn. at 125), or be seen to "specifically target[] Connecticut consumers,"

*id.* (quoting *Bell v. Shah*, No. 3:05-CV-0671 (RNC), 2006 WL 860588, at *2 (D. Conn. Mar. 31,

2006)).

For the other defendants, the Trustee Defendants argue that Mr. Plimpton has failed to

establish jurisdiction under Section 52-59b. *Id.* 8. They contend that this case involves "the

adversary proceeding in the [b]ankruptcy [c]ase in Wyoming[] and the [Lane] Family Settlement

Agreement resolving that proceeding (which [Mr. Plimpton] claims caused his injury[)]." *Id.* at

9. They argue that "contrary to [Mr. Plimpton's] assertion that it was executed in part in

Connecticut," the Lane Family Settlement Agreement was "expressly 'made and entered into in

the State of Wyoming.'" *Id.* at 9-10 (quoting Ex. to Pl.'s Obj., ECF No. 82-1 at 337 (Aug. 17,

2020)).

The Trustee Defendants maintain that Mr. Plimpton has also failed to establish specific personal jurisdiction because the contacts with Connecticut that he alleges are "too tenuous." *Id.* at 11. Mr. Plimpton alleges contact "with a single Connecticut resident (Colleen [Lane]) who was involved in the [b]ankruptcy [c]ast, not the State itself," which in the Trustee Defendants' view, are insufficient to show specific personal jurisdiction. *Id.* at 11-12.

Additionally, the Trustee Defendants argue that Mr. Plimpton's conspiracy allegations and arguments "miss the mark" because he does not meet the elevated pleading standards for conspiracies and his arguments "lack[] any factual, as opposed to conclusory, allegations that any defendants participated in a conspiracy." *Id.* at 12-13. "Even if [Mr. Plimpton] had established minimum contacts with Connecticut," the Trustee Defendants argue that burden for the various in litigating in Connecticut would be significant. *Id.* at 13. The Trustee Defendants contend that "every significant even underpinning [Mr. Plimpton's] claims occurred in Wyoming" and "[e]xercising jurisdiction over any of the [defendants] would be unreasonable and . . . violate due process." *Id.*

Timothy Lane, Colleen Lane, Patricia E. Lane, Matthew Lane, the Estate of Patricia A. Lane, and the Hathaway Defendants join and adopt these reply arguments. *See* Lane Reply at 2; Hathaway Mem. at 1-2; Hathaway Reply at 1-2.

With regard to Bank of Jackson Hole, the Bank Defendants reply that Mr. Plimpton's assertion ignores that Connecticut's long-arm statute, Conn. Gen. Stat. § 33-929(f), does not "confer jurisdiction over actions committed by a nonresident party against another nonresident." Bank Reply at 2 (citing *PSARA,* 290 F. Supp. 3d at 165). The Bank Defendants also argue that Bank of Jackson Hole "entering into a promissory note with the Boulder Investment Trust" does not confer jurisdiction because Boulder Investment Trust is an Arizona- rather than Connecticut-

based trust and even if it were Connecticut-based, "this case arises out of the Lane Family Settlement Agreement, not the promissory note." *Id.* at 2-3. Moreover, the Bank Defendants contend that the ability to access Bank of Jackson Hole account information through its website and ATMs in Connecticut does not make Bank of Jackson Hole "essentially at home" in Connecticut. *Id.* at 3.

As for Mr. Perino, the Bank Defendants argue that Mr. Plimpton's allegations about his involvement in a conspiracy with Colleen Lane do not confer personal jurisdiction because (1) Mr. Plimpton does not allege any conspiracy claim against Colleen Lane, *id.* at 4; (2) the Section 52-59b "does not permit the exercise of jurisdiction over Mr. Perino based solely on the allegation that he was a participant in a conspiracy with an in-state defendant," *id.*; (3) Mr. Plimpton has not alleged fact sufficient to "attribute Colleen Lane's [alleged] in-state tortious conduct to Mr. Perino as a co-conspirator," *id.* at 5; and (4) the fiduciary shield doctrine applied to Section 52-59b bars jurisdiction because "allegations relating to Mr. Perino involve action taken on behalf of [Bank of Jackson Hole], rather than in his personal capacity," *id.* 6-7.

The Court agrees with the Defendants' arguments.

Mr. Plimpton's personal jurisdiction arguments rely on the Lane Family Settlement Agreement and one signatory, Colleen Lane, allegedly signing that agreement in Connecticut. Based on the facts alleged in Mr. Plimpton's filings, if the Court had jurisdiction over the non-Connecticut Defendants, that jurisdiction would be derived from their "transact[ing] business within the state." Conn. Gen. Stat. § 52-59b(a)(1).

But "[t]he term 'transacting business,' as used in [Section] 52–59b(a)(1), is not broadly interpreted in Connecticut," *Vertrue*, 429 F. Supp. 2d at 489–90, and merely being involved in an agreement that happened to be signed by one person in Connecticut is not sufficient to confer

personal jurisdiction under Connecticut's long-arm statute. *See HSQD*, 2012 WL 2088698, at *3 ("[T]he negotiation or existence of a contract, standing alone, . . . is insufficient to exercise personal jurisdiction over a defendant.").

Mr. Plimpton argued that Patricia A. Lane, Patricia E. Lane, Matthew Lane, and Timothy Lane had contact with Kevin and Colleen Lane through telephone calls, e-mails, and visits, and also "communicated and negotiated with Kevin and Colleen Lane with regard to the Lane Bankruptcy." Pl.'s Am. Obj. at 9-10. Although "the existence of a contract along with substantial telephone and email communications related to the contractual relationship can be sufficient to constitute transaction of business in the forum state," *HSQD,* 2012 WL 2088698, at *3, a number of other factors suggest that personal jurisdiction under Section 52-59b is still lacking. Such factors include:

> (i) whether the defendant has an on-going contractual relationship with a [Connecticut] corporation, (ii) whether the contract was negotiated or executed in [Connecticut] and whether, after executing a contract with a [Connecticut] business, the defendant visited [Connecticut] for the purpose of meeting with parties to the contract regarding the relationship, (iii) what the choice-of-law clause is in any such contract, and (iv) whether the contract requires [the defendants] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Callahan,* 2020 WL 2061882, at *5 (alterations in original) (quoting *HSQD,* 2012 WL 2088698, at *3).

In this case, none of these factors are present. The only contact between the challenged agreement and Connecticut is the residency of one signatory, Colleen Lane. Mr. Plimpton asserts that members of the Lane family visited Colleen Lane in Connecticut, but it is unclear if these visits were related to the Lane Family Settlement Agreement or the bankruptcy proceedings. The choice of law clause in the Lane Family Settlement Agreement indicates that Wyoming is the

preferred law and jurisdiction. Pl.'s Am. Obj. at 337.  And to the Court's knowledge, there has been no payments or supervision of the agreement in the Connecticut. Thus, despite interactions between some non-Connecticut Defendants and Colleen Lane, these actions do not constitute a business transaction as required by Section 52-59b(a)(1) to confer personal jurisdiction.

Mr. Plimpton also argues that various defendants' involvement in the Lane Family Settlement Agreement constituted a tort or conspiracy in Connecticut, but these arguments only restate the same conduct that was insufficient to confer personal jurisdiction under Section 52-59b(a)(1). Mr. Plimpton has failed to demonstrate that the defendants' involvement in the Lane Family Settlement Agreement "specifically targeted a Connecticut resident with the intent to cause harm in this state, or that such harm actually occurred." *Leung v. GEICO Gen. Ins. Co.,* No. KNLCV206044553S, 2020 WL 8266953, at *6 (Conn. Super. Ct. Dec. 22, 2020) (finding allegations of tortious conduct were insufficient to confer personal jurisdiction under Section 52-59b(a)(2) when plaintiff failed to show that communications were intended to harm or did harm).

Nor has Mr. Plimpton alleged specific enough facts to establish jurisdiction based on a conspiracy given the "higher than . . . basic pleading standard" for conspiracies. *See Tadayon v. DATTCO, Inc.,* 178 F. Supp. 3d 12, 21 (D. Conn. 2016)( "The required showing, however, is higher than the basic pleading standard. To establish jurisdiction on a conspiracy theory, a plaintiff must: (1) make a *prima facie* factual showing of a conspiracy; and (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy." (internal quotation marks, and alterations omitted)). Defendants mere participation in a settlement agreement for a bankruptcy case does not lead to the inference that they were members of a conspiracy.

Finally, Mr. Plimpton's arguments that Bank of Jackson Hole, Holland & Hart, and Hathaway & Kunz conducted business in the state sufficient to establish personal jurisdiction in Connecticut also fail. Section 33-929(f), Connecticut's long-arm statute for foreign corporations, "do[es] not confer jurisdiction over actions committed by a nonresident party against another nonresident." *PSARA*, 290 F. Supp. 3d at 158 (quoting *Estate of Nunez–Polanco v. Boch Toyota, Inc.*, 339 F. Supp. 2d 381, 383 (D. Conn. 2004)). As neither Mr. Plimpton nor the foreign corporations he has sued are residents of Connecticut, Compl. at 2-3 ¶¶ 1, 2, 9, 11, there is no personal jurisdiction under Section 33-929(f).

Because personal jurisdiction has not been established under Connecticut's long-arm statutes, the Court need not and will not address the due process arguments. *See Leung*, 2020 WL 8266953, at *2   ("Only if we find the [long arm] statute to be applicable do we reach the question whether it would offend due process to assert jurisdiction." (alteration in original) (quoting *Matthews v. SBA, Inc.,* 149 Conn. App. 513, 543, cert. denied, 312 Conn. 917 (2014)); *Waldman*, 835 F.3d at 327 (requiring a "statutory basis for personal jurisdiction" before deciding whether "the exercise of personal jurisdiction must comport with constitutional due process principles"). Mr. Plimpton bears the burden of establish personal jurisdiction over foreign corporations and nonresident individuals, *see Cogswell,* 282 Conn. at 515  ("If the defendant challenging the court's personal jurisdiction is a foreign corporation or a nonresident individual, it is the plaintiff's burden to prove the court's jurisdiction."), and the Court finds that he has failed to do so.

Accordingly, Charles Hingle, Holland & Hart LLP, Patricia E. Lane, the Estate of Patricia A. Lane, Matthew Lane, Timothy Lane, Scott Meier, Lucas Buckley, Hathaway & Kunz

LLP, Bank of Jackson Hole and David Perino will be dismissed from the case under Rule 12(b)(2) for lack of personal jurisdiction.

### ii.   Gary Barney, Randy Royal, Dennis O'Malley, John Smiley, Michael Gilbert, and Ballard Spahr LLP

Mr. Plimpton makes similarly deficient arguments about the Court's personal jurisdiction over Gary Barney, Randy Royal, and attorneys John Smiley, Michael Gilbert, Dennis O'Malley, and Ballard Spahr LLP. *See* Pl.'s Am. Obj. at 6-7. But, as discussed above, the Court does not have subject matter jurisdiction over the trustees and their attorneys under the *Barton* Doctrine, and thus, need not address personal jurisdiction for these defendants.

### C.  Statute of Limitations

"In cases grounded on diversity jurisdiction the court must apply 'the statute of limitations that the court of the forum state would apply.'" *Norton v. Michonski*, 368 F. Supp. 2d 175, 179 (D. Conn. 2005) (quoting *Wells v. Simonds Abrasive Co.,* 345 U.S. 514, 518 (1953)). "Under Connecticut law, statute of limitations are generally considered 'procedural.'" *Id.* (citing *Baxter v. Sturm, Ruger and Co., Inc.,* 230 Conn. 335, 339 (1994)). Under Connecticut law, "[n]o action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues." Conn. Gen. Stat. § 52-576(a). "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." Conn. Gen. Stat. § 52-577.

Although "[a] statute of limitations analysis is generally riddled with questions of fact which the Defendants must establish in order to bar Plaintiffs' claims[,]" "where the dates in a complaint clearly show that an action is barred by a statute of limitations [] a defendant [may] raise the affirmative defense in a pre-answer motion to dismiss." *Bartold v. Wells Fargo Bank, N.A.*, No. 14-cv-00865 (VAB), 2015 WL 7458504, at *4 (D. Conn. Nov. 24, 2015); *see*

*also Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) ("'Dismissal under Fed. R. Civ. P.

12(b)(6) is appropriate when a defendant raises a statutory bar,' such as lack of timeliness, 'as an

affirmative defense and it is clear from the face of the complaint, and matters of which the court

may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"

(quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008))); *Ghartey v. St.*

*John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show

that an action is barred by a statute of limitations, a defendant may raise the affirmative defense

in a pre-answer motion to dismiss. Such a motion is properly treated as a Rule 12(b)(6) motion to

dismiss for failure to state a claim upon which relief can be granted."); *Slainte Investments Ltd.*

*P'ship v. Jeffrey*, 142 F. Supp. 3d 239, 253–54 (D. Conn. 2015) ("In short, a motion to dismiss

may be granted if a complaint's allegations affirmatively establish an action's untimeliness, but it

may not be granted simply because a complaint failed to include allegations affirmatively

establishing its timeliness.").

    The statute of limitations period may be tolled under Connecticut General Statutes § 52-

595 if the defendant "fraudulently conceals from [plaintiff] the existence of the cause of such

action," in which case "such cause of action shall be deemed to accrue against such person so

liable therefor at the time when the person entitled to sue thereon first discovers its existence."

Conn. Gen. Stat. § 52-595. In order to plead fraudulent concealment, a plaintiff "must allege with

particularity the circumstances surrounding the alleged fraudulent concealment in accordance

with the heightened pleading requirements for fraud." *OBG Tech. Servs., Inc. v. Northrop*

*Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 504 (D. Conn. 2007)) (internal

quotation marks omitted). It is the plaintiff's "burden to plead facts sufficient to establish that the

statute of limitations should be tolled in order to survive a motion to dismiss." *Id.* (collecting cases).

The Bank and Estate Defendants argue that "the face of the Complaint makes clear each claim is time-barred" because Mr. Plimpton "filed his Complaint more than six years after his claims accrued." Bank and Estate Mem. at 16. They contend:

> Patricia [E. Lane] allegedly entered into the Loan Agreement with DFWU in 2010. She and Patricia A. Lane received transfers pursuant to the loan in 2012. Then, after the Chapter 7 trustee went after the assets [Robert M.] Lane had sought to hide, Colleen [Lane], Patricia [E. Lane], and Patricia A. Lane signed the Family Settlement Agreement on February 25, 2013. [Robert M.] Lane signed the Debtor Settlement Agreement and [Bank of Jackson Hole] filed its secured claim that same year. The [b]ankruptcy [c]ourt approved both the Family Settlement Agreement and Debtor Settlement Agreement on June 20, 2013. The following day, the Chapter 7 Trustee moved the [b]ankruptcy [c]ourt to approve the [Bank of Jackson Hole] Settlement. The [b]ankruptcy [c]ourt entered an order approving the [Bank of Jackson Hole] Settlement on October 10, 2013. Plaintiff therefore had to bring his claims, if at all, by October 10, 2019, at the very latest. He did not. Instead, he filed his complaint on March 11, 2020—months too late under any legal theory.

*Id.* at 16-17 (internal citations omitted). The Lane Defendants and Hathaway Defendants join and adopt these arguments. *See* Lane Mem. at 1-2; Hathaway Mem. at 1-2.

The Bank and Estate Defendants also maintain that Mr. Plimpton's "claims against the Estate of Patricia A. Lane also are untimely for an independent reason," *id.* at 17, arguing that under South Carolina law, "which governed the administration of the estate's assets," "any claims against the Estate of Patricia A. Lane had to be timely presented to the probate court in South Carolina—not filed in Connecticut well after any potentially applicable limitations period had expired," *id.* at 17-18.

41

Citing the language of the Lane Family Settlement Agreement, Mr. Plimpton argues that Wyoming law rather than Connecticut law applies in this case. Pl.'s Am. Obj. at 28, 337.  Mr. Plimpton asserts that "Connecticut applies the substantive law of the state with the most significant relationship to the lawsuit," which he argues is Wyoming.  *Id.* at 29.

Mr. Plimpton further argues that his claims are "well within the statute of limitations" because "Christopher Lane discovered [the d]efendants' misdeeds in mid-May[] 2019" and "[t]here is no evidence that a reasonable diligent party could have discovered [the d]efendants' misdeeds sooner, particularly given their fraudulent concealment of their actions." *Id.* at 43. Mr. Plimpton contends that the Defendants' "concealment prevented Christopher Lane or [him] from discovering their misdeeds with the statute of limitations period" and Mr. Plimpton "exercised all due diligence in pursuing the discovery of matter in the time period seeking to be tolled." *Id.* at 46.

As to the Estate of Patricia A. Lane, Mr. Plimpton maintains that "Christopher Lane received no notice of his grandmother's probate and had no knowledge of the probate." *Id.* at 47. Mr. Plimpton argues South Carolina law "makes and exception to the statute of limitations when proper notice was not given" and "permit[s] late claims if the claim has merit and the party was not negligent." *Id.* at 47-48.

The Trustee Defendants reply that Mr. Plimpton's arguments fail "because none of the choice-of-law provisions [he] relies on expressly incorporates Wyoming procedural law." Trustee Reply at 14 (citing *Reclaimant Corp v. Deutsch*, 332 Conn. 590, 610 (2019) ("A standard choice of law provision" that "does not mention the procedural law of another state[] will not be interpreted as covering a statute of limitations." (internal quotation marks omitted)). They also argue that Mr. Plimpton's fraudulent concealment arguments fail because it would not

require any diligence for Christopher to become informed of the Lane Family Settlement Agreement and Mr. Plimpton's Complaint did not "allege fraudulent concealment, much less specific facts that might support it." *Id.* at 14-15.

Timothy Lane, Colleen Lane, Patricia E. Lane, Matthew Lane, the Estate of Patricia A. Lane, and the Hathaway Defendants join and adopt these reply arguments. *See* Lane Reply at 2; Hathaway Mem. at 1-2; Hathaway Reply at 1-2.

The Court agrees with the Defendants' arguments.

Mr. Plimpton filed his Complaint with this Court on March 11, 2020. Compl. He alleges thirteen counts against various defendants, including breach of fiduciary duty by trustee, conspiracy to breach a fiduciary duty by trustee, breach of contract of trustee, breach of duty of managers, breach of contract of managers, intentional tortious interference with contract, negligent tortious interference with contracts, conversion, fraud, conspiracy to commit fraud, unjust enrichment, and negligence. *Id.* at 26–32 ¶¶ 118–144. These claims all relate to the underlying bankruptcy case, the Lane Family Settlement Agreement, and various other agreements approved by the Wyoming bankruptcy court. *See id.* The bankruptcy court approved the last settlement agreement on October 10, 2013. Bank and Estate Mem. at 17; *In re Lane,* No. 11-20398, ECF No. 426 (Oct. 10, 2013). Thus, as the Bank and Estate Defendants point out, Mr. Plimpton would have needed to bring his claims by October 10, 2019 at the latest. *See* Bank and Estate Mem. at 17. As Mr. Plimpton filed his Complaint in March 2020, his claims are untimely.

Mr. Plimpton argues that Wyoming's statutes of limitations rather than Connecticut's should apply in this case. In diversity cases, however, the Court must apply "the statute of limitations that the court of the forum state would apply." *Norton*, 368 F. Supp. 2d at 179 (quoting *Wells v. Simonds Abrasive Co.,* 345 U.S. 514, 518 (1953)). The choice of law clause in

the Lane Family Settlement Agreement is not relevant because it does not speak to procedural law, *see Reclaimant Corp.*, 332 Conn. at 610  ("A standard choice of law provision" which "does not mention the procedural law of another state[] will not be interpreted as covering a statute of limitations." (internal quotation marks omitted)), and "[u]nder Connecticut law, statute of limitations are generally considered procedural," *Norton*, 368 F. Supp. 2d at 179 (internal quotation marks omitted).

Mr. Plimpton also argues that statutes of limitations are tolled due to the Defendants' fraudulent concealment of their "misdeeds." Pl.'s Am. Obj. at 43. These assertions, however, do not satisfy the pleading standard for fraudulent concealment. *See OBG Tech.*, 503 F. Supp. 2d at 504 (finding that a plaintiff "must allege with particularity the circumstances surrounding the alleged fraudulent concealment in accordance with the heightened pleading requirements for fraud"). Mr. Plimpton simply asserting that he or Christopher Lane did not become aware of the contract and tort violations that he brings in his Complaint until May 2019 does not "allege with particularity the circumstances surrounding the alleged fraudulent concealment." *Id.* Thus, the statues of limitation will not be tolled.

Additionally, whether Mr. Plimpton's claims against the Estate of Patricia A. Lane are barred by South Carolina probate law is irrelevant because they are untimely under Connecticut's statutes of limitation and, as discussed above, the Court does not have personal jurisdiction over the Estate of Patricia A. Lane.

Accordingly, all of Mr. Plimpton's claims against Colleen Lane, Charles Hingle, Holland & Hart LLP, Patricia E. Lane, the Estate of Patricia A. Lane, Matthew Lane, Timothy Lane, Scott Meier, Lucas Buckley, Hathaway & Kunz LLP, Bank of Jackson Hole, David Perino, Gary

Barney, Randy Royal, Ballard Spahr LLP, Dennis O'Malley, Johns Smiley, and Michael Gilbert will be dismissed as untimely.

### D. Defendants' Remaining Arguments

The Court has dismissed all moving defendants for lack of subject matter jurisdiction, personal jurisdiction, and/or due to untimely claims. Because no moving defendants remain in this action, the Court need not, and will not, address their remaining arguments.[2]

### E. Transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented. " 28 U.S.C.A. § 1404. "District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006). "The power of district courts to transfer cases under Section 1404(a) *sua sponte* therefore is well established." *Cento v. Pearl Arts & Craft Supply Inc.,* No. 03 CIV. 2424 (LAK), 2003 WL 1960595, at *1 (S.D.N.Y. Apr. 24, 2003).

> In determining whether transfer is appropriate, courts consider the following factors: (1) the convenience of witnesses; (2) the convenience of the parties; (3) the locus of operative facts; (4) the availability of process to compel the attendance of the unwilling witnesses; (5) the location of relevant documents and the relative ease of access to sources of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded to the plaintiff's choice of forum; (9) trial efficiency; and (10) the interest of justice, based on the totality of circumstances.

---

[2] The Court does acknowledge the force of the logic in Defendants' claim and issue preclusion arguments, and adopts them without further discussion. *See* Bank and Estate Mem. at 20-24.

*Dallas X. Evans v. Absolute Results,* No. 21-CV-00280 (LLS), 2021 WL 603227, at *3 (S.D.N.Y. Feb. 12, 2021) (citing *Keitt v. N.Y. City,* 882 F. Supp. 2d 412, 458-59 (S.D.N.Y. 2011)).

Moreover, forum selection clauses are enforced through 28 U.S.C. § 1404(a) and the doctrine of *forum non conveniens.* "Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas,* 571 U.S. 49, 60 (2013).

"When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Id.* at 62; *see id.* at 62 n.5 ("Our analysis presupposes a contractually valid forum-selection clause."). "The 'enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and further vital interests of the justice system." *Id.* at 63 (quoting *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)); *see also M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12-15 (1972) (holding that courts must give "full effect" to "the legitimate expectations of the parties, manifested in their freely negotiated agreement, by specifically enforcing the forum clause" absent a showing that "enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching").

"For that reason, and because the overarching consideration under [Section] 1404(a) is whether a transfer would promote 'the interest of justice,' 'a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases.'" *Atl. Marine,* 571 U.S. at 63 (second alteration in original) (quoting *Stewart,* 487 U.S. at 33 (Kennedy, J., concurring)).

Robert Lane is the only remaining defendant who has appeared in this case.[3] Although the same personal jurisdiction and timeliness issues would apply to Robert Lane, he filed an Answer on June 20, 2020, effectively waiving those defenses. *See Credle-Brown v. Connecticut*, 246 F.R.D. 408, 409 (D. Conn. 2007) ("[P]ersonal jurisdiction is deemed waived if not raised in either defendants' answer to the complaint or in a motion to dismiss."); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 751–52 (2d Cir. 1992) ("A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, it is waived if not raised in the answer to the complaint.").

Yet, the facts of this case, those alleged in Mr. Plimpton's Complaint and those alleged in the various motions to dismiss, all indicate that Connecticut has very little to do with any alleged dispute between Mr. Plimpton and Robert Lane. The "locus of operative facts," *Dallas X. Evans*, 2021 WL 603227, at *3, appears to be Wyoming, where the underlying bankruptcy proceedings took place. This jurisdiction also has the most "familiarity with the governing law." *Id.* Additionally, as Mr. Plimpton points out, the forum selection clauses in some of the disputed agreements, name Wyoming as the preferred jurisdiction. *See* Pl.'s Am. Obj. at 27-28, 337. Accordingly, in "the interest of justice," the Court will order the case transferred to Wyoming.

### F.  Preliminary Injunction

As all the moving defendants have been dismissed under Rule 12(b)(1), 12(b)(2), or 12(b)(6) and the case will be transferred to Wyoming under the Section 1404(a) and the doctrine of *forum non conveniens*, Mr. Plimpton's motion preliminary injunction is denied as moot.

---

[3] DFWU and Boulder Investment Trust have not filed appearances in this action.

**IV.      CONCLUSION**

For the foregoing reasons, the Bank and Estates Defendants' motion to dismiss is

**GRANTED**; the Bank Defendants' supplemental motion to dismiss is **GRANTED**; the Lane

Defendants' motion to dismiss is **GRANTED**; and the Hathaway Defendants' motion to dismiss

is **GRANTED**, and their renewed motion to dismiss is **DENIED** as moot.

Mr. Plimpton's motion for preliminary injunction is **DENIED** as moot.

The Court orders the case **TRANSFERRED** to Wyoming. The Clerk of Court is

respectfully directed to transfer this case.

**SO ORDERED** at Bridgeport, Connecticut, this 26th day of February, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE